UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIE J. GONZALES,<br><br>        Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF THE<br>SOCIAL SECURITY ADMINISTRATION,<br><br>        Defendant. | Case No. CV 12-3501-PJW<br><br>MEMORANDUM OPINION AND ORDER |

## I.  INTRODUCTION

Plaintiff appeals a decision by Defendant Social Security Administration ("the Agency"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). She claims that the Administrative Law Judge ("ALJ") erred when she: (1) relied on the vocational expert's testimony regarding the number of jobs in the economy; and (2) found that Plaintiff was not credible. For the reasons discussed below, the Agency's decision is affirmed.

## II.  SUMMARY OF PROCEEDINGS

In March 2009, Plaintiff applied for DIB and SSI, alleging that she was disabled due to arthritis and constant pain in her neck, back, legs, and joints. (Administrative Record ("AR") 124-33, 168, 183.)

Her applications were denied. (AR 74, 76, 79-83.) She then requested and was granted a hearing before an ALJ. (AR 85, 88-89.) On July 13, 2010, she appeared with counsel for the hearing. (AR 45-72.) On February 9, 2011, the ALJ issued a decision denying benefits. (AR 23-33.) Plaintiff appealed to the Appeals Council, which denied review. (AR 1-6, 17-18.) This action followed.

III.   ANALYSIS

A.   <u>The Vocational Expert's Testimony</u>

The vocational expert testified that Plaintiff could not perform her past work but could perform work as a ticket checker, order clerk, and final assembler, despite her limitations. (AR 65-66.) He determined that there were approximately 2,900 ticket checker jobs locally and 75,000 nationally, 500 order clerk jobs locally and 18,000 nationally, and 2,500 final assembler jobs locally and 60,000 nationally. (AR 65-66.) Relying on this testimony, the ALJ concluded that Plaintiff was not disabled since there were a significant number of jobs that she could still perform in the economy. (AR 31-32.)

After the ALJ issued her decision, Plaintiff appealed to the Appeals Council, submitting jobs reports from two sources--Job Browser Pro and Specific Occupational Employment - Unskilled Quarterly--that compile and analyze job statistics. (AR 209-19.) According to the information contained in these reports, there were significantly fewer jobs available in the local and national economy than the vocational expert claimed. (AR 209-19.) Based on this data, Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony that there were a significant number of jobs in the economy which she could perform. (Joint Stip. at 4-11, 17-19.) For the following reasons, this argument is rejected.

2

1    Generally speaking, an ALJ is entitled to rely on a vocational
2    expert's testimony regarding the number of jobs in the economy.  *See*
3    20 C.F.R. § 416.966(e) (authorizing ALJs to rely on vocational expert
4    testimony to determine occupational issues); *Bayliss v. Barnhart*, 427
5    F.3d 1211, 1217-18 (9th Cir. 2005) (upholding ALJ's reliance on
6    vocational expert's testimony regarding job numbers).  Further, this
7    testimony amounts to substantial evidence.  *Osenbrock v. Apfel*, 240
8    F.3d 1157, 1163 (9th Cir. 2001) (testimony of vocational expert
9    constitutes substantial evidence).  And a vocational expert is not
10   required to provide a foundation for this testimony as his expertise
11   alone is a sufficient foundation.  *Bayliss*, 427 F.3d at 1218.  For
12   this reason, the ALJ's reliance on the vocational expert's testimony
13   that there were a significant number of jobs in the economy--and the
14   Appeals Council's affirmation of that finding--was supported by
15   substantial evidence.

16   Plaintiff disagrees.  She contends that the Appeals Council
17   should have overturned the ALJ's decision and relied on the jobs
18   reports she submitted.  There is no merit to this argument.  Because
19   the ALJ reached an appropriate decision after considering the
20   available evidence, the Appeals Council was free to reject the jobs
21   reports Plaintiff submitted, which were provided after the ALJ's
22   decision.  *See Gomez v. Chater*, 74 F.3d 967, 971-72 (9th Cir. 1996)
23   (explaining Appeals Council free to reject evidence acquired by
24   claimant after adverse decision by ALJ).  And, in doing so, the
25   Appeals Council was not required to explain why it was rejecting them.
26   *Id.* at 972.

27   Even if the law were different, the Court would still affirm the
28   Agency here.  The fact that jobs numbers in the reports Plaintiff

3

submitted to the Appeals Council differ from the vocational expert's numbers does not mean that the Agency's decision was infirm.  The Agency is charged with resolving conflicts in the evidence.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) (holding ALJ's decision must be upheld where it is susceptible to more than one rational interpretation).  The Court cannot say that the Agency erred in its resolution of the conflict.

Further, the Court does not find these reports to be as nearly as compelling as Plaintiff does, largely because it is not clear what the numbers mean.  The Job Browser Pro report lists raw data for job numbers and also provides adjusted and weighted figures for the same occupations.  The raw numbers approximate the vocational expert's numbers.  The adjusted and weighted figures are significantly lower than the vocational expert's numbers, but there is no explanation as to how the lower figures were calculated.  Absent expert testimony on that subject (which it did not have), the Appeals Council would have been hard pressed to interpret these numbers on its own.

As for the job numbers in the Specific Occupational Employment - Unskilled Quarterly, they do not seem to make much sense.  For example, for the job of parimutuel ticket checker, the report on its face appears to indicate that, in the entire state of California, there were only 10 people employed in this occupation in the first quarter of 2011.  (AR 217.)  This seems like an extremely small number of parimutuel ticket checkers in a state with as many racetracks as California.[1]  Absent any explanation as to what the numbers mean, the

---

[1]  According to the California Horse Racing Board website at www.chrb.ca.gov, horse racing is enjoyed year round in California and
(continued...)

4

1    Court does not find the reports persuasive.  That is not to say,
2    however, that the Court would have found fault with the Agency had it
3    relied on these reports.  But without any explanation as to what the
4    numbers in the reports mean, the Court cannot conclude that the Agency
5    erred by not accepting them over the vocational expert's testimony.

6    B.   The Credibility Finding

7         The ALJ determined that Plaintiff was not credible because:
8    (1) the objective medical evidence did not support her claims of
9    intense pain; (2) Plaintiff's failure to receive regular treatment was
10   inconsistent with her pain allegations; (3) the type of medical
11   treatment Plaintiff received was inconsistent with her allegations;
12   (4) Plaintiff's failure to follow her prescribed course of treatment
13   undermined her pain testimony; (5) the medical opinions contained in
14   the record failed to support Plaintiff's claims of disabling pain; and
15   (6) Plaintiff's "presentation" undermined her credibility.  (AR 27-
16   31.)  Plaintiff argues that the ALJ erred in doing so.  For the
17   following reasons, this argument is rejected.

18        ALJs are tasked with judging the credibility of witnesses.  In
19   doing so, they are allowed to rely on ordinary credibility evaluation
20   techniques.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.
21   2008).  Where, as here, a claimant produces objective medical evidence
22   of an impairment that reasonably could be expected to produce the
23   alleged symptoms, an ALJ may not discount the testimony without
24   providing "specific, clear and convincing reasons" for doing so.
25   *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

26

27   ────────────────

28        [1]  (...continued)
     takes place at 15 different venues.

The first reason cited by the ALJ for questioning Plaintiff's credibility was that the intensity of her reported pain was not consistent with the medical findings, particularly the findings of Dr. Hoang, who performed an orthopedic evaluation in October 2010.  (AR 27-28, 272-76.)  This was a valid reason for questioning Plaintiff's testimony, *see Osenbrock*, 240 F.3d at 1165-66 (upholding ALJ's credibility determination in part because medical evaluations revealed little evidence of disabling abnormality), and it is supported by the record.  According to Plaintiff, due to constant pain in her neck, back, legs, and joints, she could not stand for longer than eight minutes and was unable to walk for more than 20 feet.  (AR 58, 183.)  When Dr. Hoang examined her, however, he found "[n]o significant objective findings" related to Plaintiff's complaints and concluded that she would be able to stand for two hours in an eight-hour workday with changes in position and normal breaks.  (AR 275, 276.)

Plaintiff argues that the ALJ's findings were inadequate, claiming, for example, that, though the ALJ relied on negative x-ray findings from October 2010, she "fail[ed] to correlate" these negative findings with the diagnosis of venous insufficiency in the record. (Joint Stip. at 23.)  This argument is rejected.  The ALJ was permitted to take the negative knee and elbow x-rays into account in considering whether Plaintiff's complaints of pain in her joints were credible.  Moreover, Dr. Hoang noted her vascular insufficiency but found, as pointed out above, that she could stand for two hours, as did examining internist Dr. Benrazavi.  (AR 225, 275-76.)  Further, despite finding decreased sensation in the right leg and a positive straight leg test, Dr. Benrazavi found that Plaintiff's range of motion in the lower and upper extremities was grossly normal with no

6

indication of pain.  (AR 222-24.)   Likewise, Dr. Hoang, who detected
variations in circumference measurements of Plaintiff's limbs, found
no significant objective findings supporting her alleged pain.  (AR
274-75.)   And, while Dr. Osuji noted reduced strength in Plaintiff's
legs, he found a full range of motion in her arms and legs.  (AR 234-
36.)

The ALJ also questioned Plaintiff's testimony regarding the
extent of her pain and suffering because it was contradicted by the
fact that Plaintiff had not received regular medical treatment for her
maladies.  (AR 28-29.)   Again, this was a valid reason for questioning
her testimony, *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995)
(allegations of disabling pain can be discredited by evidence of
infrequent medical treatment), and is supported by the record.   The
medical record establishes that, over a four-year period (from the
alleged onset date of March 2007 to the ALJ's decision in February
2011), Plaintiff sought treatment only three times.  (AR 257 (June
2008 visit at Hubert H. Humphrey Comprehensive Health Center with
complaints of right knee problems causing Plaintiff to fall down), 262
(August 2008 visit at Los Angeles County, USC Medical Center ("LAC-
USC") with complaints of left shoulder pain and reduced range of
motion), 270-71 (July 2010 visit to LAC-USC emergency room complaining
of pain).)   In fact, between August 2008 and July 2010, Plaintiff
sought no treatment at all.   As the ALJ noted, it does not make sense
that Plaintiff could be as incapacitated as she claimed but only seek
medical attention three times during a four-year period.  (AR 28-29.)

Plaintiff argues that the ALJ's analysis was flawed because
"[t]he law does not require receiving excessive treatment or that
[Plaintiff] abuse emergency rooms."  (Joint Stip. at 30.)   While this

7

is true, it does not undermine the ALJ's finding that Plaintiff's
infrequent trips to the doctor raise questions about her credibility.
There is a wide discrepancy between seeking excessive treatment and
seeking treatment three times in four years for constant pain and
suffering, which, according to Plaintiff, renders her unable
to walk more than 20 feet or stand for more than eight minutes,
essentially confining her to a wheelchair or a bed for most of the
day.  (AR 58, 183.)

     Plaintiff argues that she did not have the "facility" to obtain
better treatment than the "system" provided.  (Joint Stip. at 30.)
The Court is unclear as to what Plaintiff means by this.  Assuming
that she is using the word "facility" in the sense of cognitive
capacity, there is nothing in the record to suggest that she is
limited.  To the extent that she is using the term to denote financial
ability (or inability), the Court does not find her argument
persuasive.  Though an ALJ may not rely on a claimant's failure to
obtain treatment that she cannot afford as a basis for finding her not
disabled, *see Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) ("[A]
disabled claimant cannot be denied benefits for failing to obtain
medical treatment that would ameliorate his condition if he cannot
afford that treatment."), there is no evidence in the record that
Plaintiff's lack of resources had anything to do with her lack of
treatment.  On the contrary, at the administrative hearing, Plaintiff
claimed that she had sought *and received* additional treatment but that
she had been unable to locate the records documenting it.  (AR 59-62.)
In fact, according to Plaintiff, she usually received treatment two
times a week.  (AR 54-55.)  The ALJ noted that Plaintiff had not
submitted any records of this treatment and left the record open to

8

1  allow her to do so.  (AR 59-62, 70-72.)  Plaintiff never produced any
2  other records, so the ALJ arranged for her to be examined by another
3  doctor in lieu of the records.  (AR 70, 272-82.)  Under these
4  circumstances, the Court cannot say that the ALJ's reliance on the
5  dearth of medical records to question Plaintiff's testimony was
6  unfair.[2]

7      The ALJ also relied on the fact that Plaintiff had failed to fill
8  her prescriptions and had failed to undergo an MRI and an x-ray, as
9  ordered by her doctors, to question her sincerity.  (AR 28-29.)  This,
10 too, was a legitimate justification for discounting Plaintiff's
11 testimony and is supported by the record.  *See Fair v. Bowen*, 885 F.2d
12 597, 603 (9th Cir. 1989).

13     The ALJ rejected Plaintiff's testimony based in part on the fact
14 that it was contradicted by the opinions of examining physicians Dr.
15 Hoang and Dr. Benrazavi.[3]  (AR 31.)  This was a valid reason for

16 _____

17     [2]  Plaintiff argues that the ALJ failed to fully develop the
   record.  (Joint Stip. at 22-23)  In light of the fact that the ALJ
18 kept the record open following the hearing to allow Plaintiff to
   submit additional records and, as a backstop, arranged for Plaintiff
19 to be examined by another doctor when no records were found, this
   argument is rejected.  *See Tonapetyan v. Halter,* 242 F.3d 1144, 1150
20 (9th Cir. 2001) ("The ALJ may discharge [her] duty [to develop the
   record] in several ways, including: subpoenaing the claimant's
21 physicians, submitting questions to the claimant's physicians,
   continuing the hearing, or keeping the record open after the hearing
22 to allow supplementation of the record.").

23
   [3]  The ALJ rejected the opinion of a third consultative examiner,
24 Dr. Osuji.  (AR 30.)  Plaintiff argues that the ALJ erred in doing so
   because she "ignored without stating why she rejected the opinion of
25 Dr. Osuji" regarding Plaintiff's need for a cane or wheelchair.
   (Joint Stip. at 23-24.)  This argument is belied by the record.  The
26 ALJ rejected Dr. Osuji's opinion because it was dependent on
   Plaintiff's subjective report of her condition, which the ALJ found to
27 be exaggerated.  (AR 30.)  This was a legitimate justification for
                                              (continued...)
28

9

questioning Plaintiff's testimony.  *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (holding ALJ's finding that claimant retained the residual functional capacity to perform a limited range of medium work supported by substantial evidence where no doctor opined claimant was totally disabled); *see also Harper v. Sullivan*, 887 F.2d 92, 96-97 (5th Cir. 1989) (substantial evidence supported ALJ's conclusion plaintiff's complaints were not credible where "[n]o physician stated that [plaintiff] was physically disabled").  And, as discussed above, it is supported by the record.[4]

_____

[3]   (...continued)
rejecting the doctor's opinion.  *See Tommasetti*, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible.") (internal quotation marks and citation omitted).  Moreover, the ALJ included Plaintiff's need to use a cane in her residual functional capacity determination.  (AR 26.)

[4]   The ALJ also purported to discount Plaintiff's testimony based on her "presentation," though there was no further discussion on this issue.  (AR 28.)  A fair reading of her decision suggests that she did not consider this factor at all.  To the extent that she did and that she was referring to Plaintiff's demeanor and appearance at the hearing, this was not a valid reason to question Plaintiff's credibility.  *See Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985) ("The ALJ's reliance on his personal observations of [the claimant] at the hearing has been condemned as 'sit and squirm' jurisprudence.") (citations omitted).  Nevertheless, even if the ALJ did rely on Plaintiff's appearance here, any error was harmless in light of the other, legitimate reasons that the ALJ relied on to reach her credibility determination.  *See Carmickle v. Comm'r. Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (explaining "relevant inquiry . . . is whether the ALJ's decision remains legally valid," despite errors in the credibility analysis).

IV.   CONCLUSION

For the reasons set forth above, the Agency's decision is affirmed and the case is dismissed with prejudice.

IT IS SO ORDERED.

DATED: April 15, 2013.

_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\GONZALES, 3501\memo opinion and order.wpd

11